Good morning, and may it please the court. My name is Holly Harris, here this morning on behalf of the appellants, and I would like to reserve five minutes for reply. All right. The thrust of this morning's case addresses the unique and demanding obligation the Clean Water Act imposes on this agency when it authorizes a private company's spill prevention and response effort. This agency alone is the only time the federal government makes specific, site-specific, choices about whether a private company has enough boats, oil spill response boom, people, containment, skimmers, to not only clean up the oil, but as Congress made clear in the statute at 1321A8, to do what is necessary to protect public health, fish, wildlife, shorelines, and beaches to the maximum extent practicable. As the federal government's own spill plans admit in this instance, the Bureau is approving, quote, the primary guidance document for the spill response effort, SCR 319. Those plans also admit that, quote, Shell must direct its own contain, control, and clean-up efforts. I don't want to, since you have limited time, are you still making the claim that Shell said it would clean up 90% of the oil? Yes, we are. You seem to continue to make this claim, and I found in the record it's hard to find that Shell ever made that claim. Well, I'll point you to the language of the spill plans, Your Honor, and now I'm quoting from Shell's own Beaufort spill plan. Quote, due to the scale of the initial response to the oil farther offshore, relatively small quantities of oil are expected to reach the beaches. That's at ER 909B. But that doesn't say that they claim to clean it all up. The plans say that Shell assumes it will recover. The primary defense here is, well, recover doesn't mean recover. The plans don't mean what they say. Even if we accept your interpretation, did the Bureau ever rely on that? I'm sure the Bureau knows that a 90-plus percent recovery rate is impossible, so what difference does it really make? It makes a fundamental difference in this instance, Your Honor. The federal government admits that Shell has an overwhelming bias in this instance in terms of its offshore readiness as compared to the resources that will protect Alaska's shorelines. I point you to the federal brief at 24 making that acknowledgment. But the Oil Pollution Act doesn't require Shell to estimate its recovery rate, does it? No, Your Honor. It imposes a fundamental obligation on this agency to ensure that this private company is prepared to the maximum extent practicable to clean up and protect the environment and wildlife. But they never claim it's possible to recover 90 percent of the oil. I like Judge Wood. I don't see what difference this makes. It makes a difference because here the agency erred for two reasons. The agency never considered what happens if more oil hits the shoreline. How many more resources would Shell need if more than 5 or 10 percent of the oil hits shore? There's no dispute in this case the agency failed to conduct that analysis. That alone renders the decision arbitrary for the agency failing to address a critical aspect of this case. I'll point the Court as well to ER 283 in which Shell is explaining that based on those efficiencies, quote, the total volume of oil that would be released, escape containment and recovery, and spread on the water's surface, end quote, is less than 10 percent. The fact is the plans mean what they say. The story started changing after the public comment process, after the interagency review process began and was underway. I will remind Your Honor that this is not an instance in which Shell was basing this on some assumption about how much oil was going to, a particular trajectory suggested how much oil would go ashore. That's not what the spill plans say at 907, 909B. That's not what Shell said at ER 283. And, in fact, Shell relied on the exact same planning assumptions in the old Beaufort spill plan at FER 97 and 69 when the spill trajectory had the oil coming ashore within a number of hours. Let me have you address the consultation requirements and whether the Bureau's approval constitutes an agency action. Certainly, Your Honor. The question that this Court will address is that this agency alone decides what Shell brings to the Arctic Ocean. What resources? What personnel? Where are those resources staged? How many boats? How many feet of boom? Where should that be stored? The Clean Water Act requires Shell to implement these plans. That's at 1321C3B and J5F. The Bureau's own regulations, and I'm quoting, Shell must immediately carry out the provisions of these spill plans. That's at 254.5 paragraph 8. Shell, in fact, can't even deviate from these plans unless it's directed to do so. The culmination of those events, as reflected in the federal government's own spill plans, which require Shell to begin cleanup immediately, it doesn't sit by and watch the oil spill. Well, the statutory provision that you rely on, which is Section 1321J5F, says that Shell can't handle, store, or transport oil unless it complies with a plan that's approved, right? So Shell has to comply with the plan, but does that mean the reverse? That approval of the plan then authorizes the handling and transport and storage? I'm not sure I follow the logic of that. Shell admits in its own spill plans that it is authorized and does have responsibility to begin cleanup immediately, ER1119 and ER1113. But the agency's own regulations reflect that immediacy. Shell must immediately carry out the provisions of these spill plans. Again, 254.4A. But the federal government's plans here are illustrative of this same point. The federal government in the Arctic Ocean doesn't have... Let me slow you down for a second because I'm not sure that I follow that. Shell has to comply with the plan, right? But does that mean that the agency approval constitutes the authorization? Yes, Your Honor. That's your argument. This is the only agency that makes those decisions. There might come a time in the future where another agency will step in if Shell isn't doing a good job, if Shell is ignoring an important area, or if there's something more that needs to be done. But according to the federal government's own spill plans, this is the primary spill response document. This document describes how Shell will protect environmentally important areas. Fundamental questions. Do we have enough boats to protect places like Ledyard Bay? Do we have enough people? Do we have them in the right locations? Those questions are never answered at any other stage of spill planning. Counsel, let me ask you this. Is it your position that the regulations do not define the Oil Pollution Act's quote, maximum extent practicable standard at all, or that they provide only a partial definition? No, Your Honor. The regulations clearly define maximum extent practicable, and it is a demanding standard. At 254.A, in defining maximum extent practicable, this agency said it is within the limits of available technology, within the physical limitations of personnel. So we're not talking about impossibility, but it is a demanding and weighty obligation. After the Exxon Valdez, Congress didn't want oil companies sitting idly by and watching our shorelines contaminated with oil. Congress wanted action, immediate action, at the hands of the responsible party. And here, that's Shell, not the government. Shell doesn't sit by and wait for the government to come in and make these decisions. So that demanding standard is reflected in the regulations. And I think it's important here that the regulations are fully consistent with this obligation. The regulations explain how the company prepares a spill plan. That's at 254.20. Those regulations do not determine what an agency will deem sufficient. Those regulations describe how you format a plan. That's at 254.21. But there's a second step in this inquiry. The agency must decide, is that adequate? Is it good enough to reach this demanding threshold of maximum extent practicable? Again, this is the only time in the entire scheme a federal spill response plan in which Congress imposed that standard. So you rely on that language to the maximum extent practicable to say, well, look, the agency has discretion in determining what's enough, what is proposed by Shell and whether that's sufficient, technologically sufficient and feasible. But the government's response, as I understand it, and Shell's response is, look, there's a statutory provision and they're not relying on that portion of the statute. There's a different statutory provision that sets out very specific requirements. And if the response plan meets those requirements, that's the end of the matter. That to me suggests no discretion. They can ask for additional information, and that's something that was argued in your briefs, but the ability to ask for information alone doesn't necessarily suggest to me that there's discretion. So where does Chevron deference come in? Let me answer that in two ways, Your Honor. First, the language of the statute is clear, as Your Honor has pointed out. There is an obligation on this agency to ensure this company is ready to clean up an oil spill and protect the environment and wildlife to the maximum extent practicable. There is no dispute there. There is no ambiguity. That must be enforced. But even if you conclude the statute is ambiguous for some reason, the agency has never promulgated its purported interpretation. These regulations do not govern approval. They govern what the agency looks at and considers, and it's important to recognize the agency has a right to do so. No, I understand that. My question isn't really focusing on any ambiguity in the language of to the maximum extent practicable. And my point really is that the government is relying on a different portion of the statute that says there are six specific requirements listed. If the response plan meets those requirements, we grant approval. And so there's two different portions of the statute here. You're relying on to the maximum extent practicable. They're relying on a different portion of the statute. And so where there's two different readings, don't we have to apply Chevron deference to say, well, the government's reading is such that we have to defer to that? There actually is no conflict here, Your Honor. There is the obligation. If the agency concludes its maximum extent practicable, it must approve. And yet the government and shall both acknowledge that other spill plans, provisions in the Clean Water Act, Section 1321, that includes shall and shall approve formulations, do trigger ESA consultation. And yet they've never distinguished why it would apply, for example, to the federal government's area contingency plan with shall and shall approve requirements, establishing the requirements akin to what you've just described, and why it doesn't trigger those same obligations here. It's important to remember here the agency acted with discretion in the very record before us today. The Deputy Secretary of the Interior said, how soon after an uncontrolled event are we requiring shall to install a capping stack and to deploy its containment equipment? There are no regulations that require that equipment. This agency required it. I point you to FER 64 ER 293. But this agency went farther. It required changes that originated with other agencies. As a reminder to the Court, this took months of review, a presidentially appointed task force, and part of that review solicited input from those other agencies, and that's now reflected in these ultimate plans. That's at FER 60 to 64 and 74 and 75. But I'll remind the Court as well that an agency staffer is quoted as saying, you don't want to remove your discretion to approve or disapprove the plan based on it as a whole piece. This agency not only has discretion, it has the obligation. Congress changed the statute specifically to require an independent and serious examination. What the federal government and shall have distilled that to is a ministerial act. It's a simple yes-no inquiry. There's nothing simple about cleaning up an oil spill in the Arctic Ocean. These are complex, fundamental, and very challenging questions, and this spill plan, these spill plans, are the only time those questions The regulations require the government to have a plan as well, and the plan does, it seems to me, require extensive consultation. So there's already detailed consultations done. What does requiring consultations in this particular context accomplish? It seems somewhat duplicative to me. Let me answer that in two ways, Your Honor. First, it's not duplicative because consultation and NEPA review in this instance would answer fundamentally different questions. We're not asking questions this time about where to drill in the Arctic Ocean or where to lease in the Arctic Ocean. This is do you have enough equipment? Is it in the right location? Are you prepared to protect endangered species floating on the surface of Leadyard Bay? Do you have enough boom to be able to do that? Can Shell protect areas of importance to polar bears in the Beaufort Sea, for example? But turning to the area contingency plans, I think it's important to understand the relationship between these plans. Your Honor is correct that the federal government identifies those areas in its plan, but it's only Shell that explains how it's prepared to protect those areas. I point your attention to SCR 331 and 332. The spill plans at issue in this case dictate how Shell expects to protect those resources, and this is the only plan that does that. With that, I'll reserve the remainder of my time. All right. Thank you very much. Good morning. May it please the Court. I'm Maggie Smith here representing the United States. I'd like to reserve seven minutes of my time for counsel. How much? Seven minutes for counsel for the intervener defendants. Here, the statute and the regulations set forth a scheme in which facility operators must submit oil spill response plans that contain particular elements. Those elements are further refined by the regulations that tell facility operators what specifically they must do in order to meet the requirements of the statute. Here, BSEE, the Bureau of Safety and Environmental Enforcement, must ensure that such plans contain those particular elements. Counsel, could I just ask a preliminary question? You talk about Chevron deference in your briefs. Why is Chevron deference warranted in this case? Where do the regulations even purport to define the maximum extent possible standard? I think what we actually have here is a disagreement about what the regulations themselves mean. It is BSEE's view that the regulations should be interpreted to lay out the extent of the obligation of facility operators in terms of what they have to provide. So the question is indeed more one of our deference, and an agency is entitled to say what it is that its regulations mean unless that interpretation is plainly erroneous. Here, BSEE has never required any submission that goes beyond the requirements of the regulations. It is very true, and it is certainly the case here, that BSEE has an obligation to ensure that the requirements of the regulations are met, but it has never gone beyond the requirements of those regulations. And you're talking about the six specific requirements under 1321J5D? That's right. That's right, and it is the regulations that inform operators what exactly they must do in order to meet that standard, that step forth in the statute. And once that obligation is completed, BSEE has no further authority to order additional changes or add elements that go beyond the statutory requirements. And that's really what's at issue here. The plaintiffs have... Well, is it the agency's position in practice then that once these six requirements are met, that's the end of the matter and the plan is approved, even if there's something technologically more advanced out there that's available, that's not included in the shell plan? To answer your question about additional technological advances, the regulations require a description of the equipment that is going to be used in the event of a spill. So if Shell has, for example, a cabin containment system outlined in its exploration plan, which is what happened here, it's required under the regulations to supply a description of that equipment and how it will be used. And that is what the regulations require, and that is the extent of BSEE's authority in that regard. Most critically here, BSEE's analysis of... because we learned in consultation with some other companies' plan that there's something better out there. So we think that what you've submitted is not technologically advanced enough to meet the maximum extent practicable standard under the statute. BSEE doesn't do that, doesn't have the discretion to do that. The regulations talk about the equipment that's going to be used that's going to meet a particular standard, and that's the effective daily recovery rate. So Shell has options in determining how it is going to meet that performance standard, that requirement. If it has more efficient equipment, it can use that. If it has more boats, that's also an option. And BSEE itself doesn't have the discretion to choose amongst that suite of options available to the operator. I hate to interrupt your argument, but of course this is the purpose of oral argument. It's a complex case and extensive, very fine briefing. I'd like to ask a question about consultation under the Endangered Species Act. Under this act, why should the Bureau be given the authority to decide whether sufficient consultation has already taken place? Wouldn't it make more sense to conduct a new consultation in order to determine whether the prior consultations are enough for agency action? Here, BSEE is not making a determination about whether or not the previous consultations were sufficient. BSEE, because the regulations and the statute bound BSEE's authority, the ESA consultation requirement simply doesn't attach to this type of approval. What is really critical here, however, is that it is the Area Contingency Plan that sets forth the federal government's discretionary decision-making on oil spill response strategies, protection of fish and wildlife, prioritization of special areas, dispersant use, in-situ burning, all of these issues where the federal government has to make important choices about how these things are going to be addressed. And it is for that reason, because it is at that level that the federal government is exercising its discretion, that consultation, to the extent that consultation is required on these issues, needs to be done at the Area Contingency Plan level. Now, if for whatever reason there was a question as to whether or not that consultation was sufficient, then that's an issue for a separate case. It's not an issue that's presented in this case. And in this case, that consultation is moving forward and that consultation on the Unified Plan for Alaska is being conducted. Did you suggest that the Bureau did not determine whether adequate consultation had taken place? The Bureau did a determination of NEPA adequacy. And the Endangered Species Act. The Bureau concluded that it did not have the requisite discretion or authority to trigger the requirements of Section 7 of the Endangered Species Act. And that determination was proper, given the limitations on BSEE's authority and the statutes, the way that the statute works, putting that type of discretionary decision-making and authority in the federal government at the Area Contingency Plan level. And this is something that I think is a really important point, that consistency with the Area Contingency Plan is the number one thing that oil spill response plans are required to have, that the statute requires oil spill response plans to have. And it's also put throughout BSEE's regulations that consistency with the Area Contingency Plan is the touchstone. That is an absolute requirement for all of these facility response plans. And the regulations, in fact, have, I think, a useful diagram at 40 CFR 300-.1210. It's at A24 of our supplement that shows the national oil spill response system. And it puts the ACP at the center of all of the potential response plans that might be put forward by private entities, by vessel owners, by state and local governments, and by individual federal agencies. All of them need to be integrated with the ACP. And that's why it's at that level that the federal government is exercising its discretion in making these important decisions. But at this level, your position is that there's no discretionary agency action, so the consultation duty is not triggered. That's right. This case is very similar to the situation that was considered by the Supreme Court in Home Builders, where there is a list of statutory factors and the agency has a duty to ensure that each factor is met and indeed does have to exercise its discretion in determining whether or not the factor itself has been met, but has no authority to go outside that enumerated list supplied by Congress and add additional factors that Congress did not intend for it to consider. And again, in this case, one of those enumerated factors is, in fact, consistency with the Area Contingency Plan. And it's through that inquiry, which I think, you know, if you look at the analysis that Bessie performed to ensure that these response plans were adequate, and you can see this at SER 761, when it goes through the regulatory requirements, it is checking each one to make sure that there is consistency with the Area Contingency Plan or the ACP. But isn't discretion involved in making that decision about each factor? Bessie does have to exercise its discretion to determine whether or not the requirements of the factor are met, and that's precisely the situation that the Supreme Court encountered in Home Builders. But that alone is not sufficient to trigger an independent round of Endangered Species Act consultation. And here, it's a very important question as to what exactly would be accomplished by imposing this additional round of consultation, where these issues have been thoroughly examined and vetted by the appropriate wildlife agencies. They've looked at these issues at numerous different stages and at many different levels. I think that is something that truly distinguishes this case from a lot of the other cases that are in the briefing, where the question there was whether or not environmental analysis would occur at all. Here, we're simply talking about what level it is most appropriate to cite this type of analysis. And here, it's clear, in the opening brief, the plaintiffs focused significantly on dispersant use and in-situ burning. But once you reference the Area Contingency Plans on those topics, it is very clear that use of those types of methods have to go through an extensive either pre-authorization process in the ACP, which is subject to consultation, and then additional approval by the federal on-scene coordinator who … I did ask counsel whether the consultations would be duplicative, and her response is that the consultations in this particular case that they're asking for really answer different questions. How do you respond to that? I mean, first of all, it's not clear that whether, you know, where shall cite boats is necessarily an action that may affect listed species, provided that those boats are capable of responding to a worst-case discharge. And that's a separate question. But with respect to what discretion Bessie has, that, again, is bounded by the regulations, which tell Bessie to look at the trajectory analysis to see where the oil will go and then to ensure that Shell has the appropriate amount of equipment, as defined by the regulations, to respond to a discharge. I see that my time is up. Are there any further questions from the panel? Thank you. Thank you, Your Honors. Kathleen Sullivan for the Shell Intervenors. I'd like to begin by agreeing with the Court that there is no basis in the record to suppose that Shell claimed a 90 percent recovery rate, and so that is not a basis for finding Bessie's approval of the plan improper here. Shell claimed a recovery capacity, as it was required to by the regulation. We have room for this many barrels a day in relation to this many possible discharge barrels a day. That was what Shell reported. And what Shell said about the shoreline was to conform with an Alaska consistency requirement that asked you to talk about the shoreline. And all Shell did is say, if 10 percent reaches the shore, here's how we'll deal with it. It didn't suggest it would recover the other 90 percent. The other 90 percent would simply not reach the shore. As Your Honors pointed out, there's no question that the record says that Shell did not claim it was a recovery rate. That's at SER 720. In response to comments, Shell says Shell's plan does not present a 95 percent recovery rate. It does not assert any recovery rate. And as Your Honors pointed out, Bessie didn't think it was a recovery rate. That's clear from SER 737, in which Bessie said, in accordance with state of Alaska regulations, Shell assumes 90 percent of the oil will remain offshore. It doesn't mean it will recover it. Nowhere does Shell claim that they would be able to collect 90 percent of the oil released in the blowout. So Shell didn't assert a 90 or 95 percent recovery rate. Bessie didn't rely on it. And that is not a ground for rejection of Bessie's reasoned determination here. So that's point one. I think it's dispositive and easy. Let's turn to the core of Your Honors' questions about whether Bessie had a nondiscretionary obligation to approve the plan if the regulatory requirements were met. Because if that obligation was nondiscretionary, that decides both the ESA challenge and the NEPA challenge. And I'd just like to refer back, Your Honors, to the statute and why we believe in agreement with the government that the statute is quite clear, the authorizing statute is quite clear, that if the response plan contains the factors in the checklist and if the agency has determined in its exercise of discretion that the factors in the checklist are submitted in the plan, then Bessie shall approve any plan that meets the requirements of this paragraph. And that for ease is reprinted in the addendum to the blue brief at page A9. It's the statute at E. And that term shall is very important here. The OSRP approval is just one small part of a multi-step process. And, Your Honors, in answers to your concern that, well, when do the ESA consultations take place about effects on endangered species, they take place elsewhere in the process. And in answer to the question, when does the NEPA analysis take place, it takes place elsewhere in the process. But what the NGOs are asking you to do is quite extraordinary. It's to impose a, for the first time, a new duplicative layer of ESA consultation and NEPA review on a checklist statute, a statute that's just about making sure that Shell has adequately told the government, here's what we have in our toolkit to clean up a spill. We've checked every box. We've shown you what we've had. That is not a point where consultation should take place. It would be duplicative. That is not a place where NEPA analysis should take place. Could I ask a question? Yes, Your Honor. Wouldn't analysis of Shell's oil response equipment methods help the Bureau determine whether to approve Shell's plan? If so, why doesn't NEPA require the Bureau to perform that analysis? Your Honor, NEPA does not require the Bureau to perform that analysis. In answer to your first question, Your Honor, no. The agency does not have discretion to decide among alternatives for oil response plan at this stage, and the reason is the mandatory language of the statute. The President, or in this case DOI, shall approve any plan that meets the requirements of this paragraph, that is, that reports the capacity to clean up a worst-case discharge as in the six factors in Section D. So there is no discretion at this point to decide among alternatives. Isn't there discretion to decide whether it meets the standards? Yes, absolutely, Your Honor. No, not meets the standard. Whether the factors required to be reported in the plan have been met. There's discretion to decide whether Shell has answered the questions it's required to answer. Is there any discretion in deciding whether Shell has responded appropriately? Oh, there's discretion to decide if Shell has answered appropriately as to the factors. There is discretion to decide, as the government just said, we're in agreement. There's discretion to decide whether the factors 1 through 6 in Section D as interpreted in the regulations, in 30 CFR 254.26, for example, with respect to a worst-case discharge. There's discretion to decide if the factors have been met, but there is not discretion at this stage to engage in other forms of analysis. And if you have any doubt on that, then you should give at least our, if not Chevron, deference to the government's own interpretation that its regulations do exhaust the statute. But, Your Honor, could I get to why it would be duplicative? Sure. On ESA, Your Honor, because I think you've asked the central question, is this to impose a duplicative, unnecessary, burdensome layer of consultation? It would be because that consultation takes place on wildlife, with the wildlife agencies. Not only in the Area Contingency Plan, as my colleague from the government has ably pointed out to you, it also took place, Your Honors, back at the lease sale. Your Honor wonders, when was the consideration of oil spill cleanup, consideration of the effects of oil spill cleanup on endangered species, was that ever considered in consultation with the wildlife agencies? Yes, Your Honor, it was considered in the biological opinions at the lease sale stage. They considered not only the effects of the spill, but the effects of the cleanup of a spill. And if I could refer Your Honors, because this is important, this is a place in the record where this consultation did take place. It's ER 1241-55, ER 1267-1301, and SER 537-87. So, Your Honor, we're not saying consultation should never take place. We're saying it's a many-tiered process, many-step process. It shouldn't take place here. Same thing for NEPA, Your Honor. Just respectfully and briefly, if I could go over my time just to tell you. The same analysis really applies because the question is whether there's discretionary agency actions. That's exactly right. And we say no discretion and you're done with ESA and NEPA. But if you had any doubt, the consultation – sorry, the NEPA analysis also took place at a prior stage. And you can find that very easily if you look at SER 769-772 and SER 1346-1349. Those are the so-called documentation of NEPA adequacy reports where the agency said, well, we did our NEPA analysis back in connection with the lease sale and back in connection with the exploration plans. And so we're looking back to that prior NEPA analysis. We're not going to repeat it here in a checklist, toolkit, non-discretionary portion of this multi-tiered process. I think we've got your argument as well. Thank you, Your Honor. Thank you very much. Your Honor, we respectfully request that you take account of the fact that a decision sooner rather than later would be very much appreciated. So Shell has to make a lot of investment decisions in order to keep its options open for the potential 2015 season. And those investments would have to take place by the end of the year, if you could take that into account. We're aware. Thank you, Your Honor. Let me address a couple of quick points briefly. First, with regard to deference to the regulations and the agency's interpretation, there is no regulation here that governs the agency's approval. Remember, there is a two-step process. Shell proposes a cleanup response prevention plan, and the agency says, is this good enough? Is it good enough for a particular facility? This is for a particular operator. And so the agency's decision here isn't just yes, the checklist suggestion. There are words on the page. This isn't about words on the page. Do those words represent the substantive mandate and fulfill the mandate that this agency has under the Clean Water Act? The regulations do not address that issue, and as a result, there would be no deference owed. But it's also inconsistent with the agency's own actions in this case. Of course this is a case of adequacy. Is this good enough? There's nothing objective about how many boats or how many people Shell needs. It's not just the regulations, as the government and Shell pointed out. It's really statutory because 1321J5D says that the plan shall meet the six requirements. Once the requirements are met, the plan shall be approved, or the president shall approve that plan. That's mandating statutory language. Yes, Your Honor, just like the Area Contingency Plan requires and imposes the Shell obligation, and yet they suggest consultation attaches to that decision. But let me point to homebuilders and why it's different than homebuilders. The section of the Clean Water Act at issue in homebuilders prohibited the agency from considering impacts on the environment or on listed species. Congress sought to delegate, and the entire policy behind the permitting process was to delegate that authority to a state agency. Here, what you're being asked by the government and Shell is, when the agency decides whether a company is prepared to do everything possible to protect the environment, to protect wildlife, to the maximum extent practicable, it doesn't consider the environment. It doesn't have to consider impacts to wildlife. The suggestion is nonsensical. With regard to two quick points, and this is the importance of the Area Contingency Plans, the obligation to be consistent is not really the driver behind these plans. Certainly they must be. These plans can't be operating inconsistent with the government. But the standard unique to these plans is the maximum extent practicable standard, and after Exxon Valdez, Congress imposed that solely on these plans, and this agency alone decides whether that standard has been met. These plans are unique in that regard. But point to the federal government's own spill plans. Those spill plans admit that in the Arctic Ocean, Shell provides all of the spill response equipment. There are no federal resources available. The Coast Guard's roughly 1,000 miles away. I point you to ER-517B. The major port, more than 1,000 miles, roughly 1,300 miles away. If Shell doesn't have it, it will take weeks, if not months, to get those resources on site. The suggestion that these choices can't affect endangered species or the environment generally is also unsupported by the record. Here this agency has allowed Shell to keep its near shore response assets hundreds of miles away, not even in the same sea. It's in a completely different sea that this record has demonstrated could be prohibited from mobilizing between the two seas because of the adverse weather conditions in the Arctic Ocean. But let me point very briefly to the issue of skimming capacity, what you'll hear referred to as effective daily recovery capacity. Your Honor, that is one piece of the equation. As the plain language of the regulations makes clear, I point you to 25426D. The effective daily recovery capacity addresses only skimmers. How much oil can move through that skimmer? It doesn't address people or boats or boom or what areas to prioritize over others. It is one piece of the puzzle. And as we learned after the deep water horizon, it's all too easy for oil companies like Shell to claim an inflated, as the National Oil Spill Commission noted, an inflated but utterly unrealistic expectation as to skimming, especially in a record that demonstrates that adverse weather conditions in the Arctic Ocean will render spill response impossible for vast majorities of the summer, even in the warm water or the warm season, pardon me, and impossible, of course, the rest of the year as the Arctic Ocean freezes over. Your Honor, we ask that you give this section of the Clean Water Act the fundamental and paramount importance Congress intended. These plans are unique. These choices are important, and they affect the environment, and they affect the people on the North Slip of Alaska. Thank you very much, counsel. Thank you to all counsel for your very helpful argument in this case. The matter stands submitted for a decision by the court. We'll be in recess for five minutes. Thank you. All rise. This court stands in recess for five minutes. Five minutes. Five minutes.
judges: FARRIS, NELSON, NGUYEN